RAINES *v.* RICHTER.

5-2185                                        338 S. W. 2d 331

Opinion delivered September 26, 1960.

*W. M. Herndon* and *H. B. Stubblefield,* for appellant.
*Spitzberg, Bonner, Mitchell & Hays,* for appellee.

CARLETON HARRIS, Chief Justice. This is a will contest. Mary Gavet, a resident of Little Rock, died on July 19, 1959, at the age of 82. Mrs. Gavet had executed a will on April 14, 1953, wherein certain bequests were made to various institutions and individuals, the bulk of the estate, including real estate located at 806 Center Street in Little Rock, being bequeathed and devised to Theresa Korte Raines, appellant herein. Mrs. Raines was not related to Mrs. Gavet, but had been a good friend for a long number of years. This will was turned over to Mrs. Raines, named co-executrix in the instrument, by Mrs. Gavet, together with a codicil, executed in 1955, and remained in possession of appellant until after the death of Mary Gavet. On October 23, 1956, Mrs. Gavet executed a second will, wherein all former wills were revoked, and some twenty-eight bequests were made to institutions and individuals, including a bequest to appellant in the amount of $4,000. C. H. Richter and Warren Baldwin of Little Rock were named executors. Item 12 of this will, which occasions the present litigation, provides:

"12. At the present time I own and reside in my home place, which contains rental units, located at 806 Center Street, Little Rock, Arkansas. If I am the owner of this property at the time of my death, I direct that the Roman Catholic Bishop of the Diocese of Little Rock be given the first opportunity to buy the property at its fair market value. If the Bishop elects to make an offer for the purchase of the property, the court having jurisdiction of my estate shall pass upon the reasonableness of the offer and shall direct the sale of the property to the Bishop if the court determines that the offer represents fair market value of the property at the time."

Following the death of Mrs. Gavet, Mrs. Raines offered the 1953 will and the 1955 codicil for probate; subsequently, the 1956 will was offered for probate. Following a hearing, at which numerous witnesses testified, the Probate Court found that the testamentary dispositions executed by Mrs. Gavet on April 14, 1953, and December 14, 1955, "are not the last will and testament of the decedent"; and admitted to probate the will dated

October 23, 1956. From the order refusing to admit to probate the earlier instruments, and admitting the latter will, Mrs. Raines brings this appeal. For reversal, appellant relies upon two points:

"I.

"The execution of the 1956 will was procured through undue influence at a time when deceased did not possess testamentary capacity.

"II.

"Deceased was mentally incompetent to execute a will on October 23, 1956."

I.

The proof r e f l e c t e d that the title to property on either side of 806 Center Street was held by the Catholic Bishop of Little Rock, and the evidence reflected that the Bishop, through Richter, had endeavored on several occasions over the years, to purchase Mrs. Gavet's property. Mrs. Gavet did not consent to sell the property. Mrs. Raines contends that undue influence was exercised over Mrs. Gavet by Harry Richter, as agent of the Bishop; next, by the attorney who prepared the 1956 will, as an agent of the Catholic C h u r c h ; and finally, by "somebody"—"I'm saying she was influenced to make this will by somebody, because she would not have done it." When interrogated as to her reason for stating that the attorney who prepared the will exercised undue influence, and that such attorney represented B i s h o p Fletcher, appellant answered: "Just because I believe that is what it is. * * * I know that somebody influenced her." She then mentioned several priests that she thought exercised undue influence over deceased, but when asked her basis for making this statement, said: "Well, those are the people it would be since she did it. Somebody influenced her, and those are the people it would be since she did it. Those are the people that are closest connected to it that I could put a finger on."

Appellant admitted on cross-examination that she did not know whether Richter ever mentioned anything to

Mrs. Gavet about the provisions of her will. The only other person testifying on behalf of appellant, whose testimony even remotely touched the issue of undue influence, was Beatrice Anthamatten. Mrs. Anthamatten testified that Mrs. Gavet did not want the Bishop to have her property, and told her (Mrs. Anthamatten) that she was leaving her place to "the one that has done the most for me. The Bishop has never raised his hand for me." The witness testified that Mrs. Gavet stated that her deceased husband would not have wanted the property sold to the Bishop. "They felt that they had done enough for the church." She stated that Richter had tried to purchase the property several times from Mrs. Gavet, and that these conversations would always upset the latter. This is the sum total of the evidence offered by appellant on this point, and obviously falls far short of establishing undue influence. In fact, appellant was unable to point to any specific person who suggested the disposition of the property as made in the 1956 will — or any specific act of undue influence. Mrs. Raines simply feels that undue influence must have been exercised, because, in appellant's view, Mrs. Gavet would not have otherwise thusly disposed of the property. In *Dunklin* v. *Black,* 224 Ark. 528, 275 S. W. 2d 447, this Court quoted with approval from the case of *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590, as follows:

"As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specially directed toward the object of procuring a will in favor of particular parties."

We find no merit in this contention.

## II.

The record reflects that Mrs. Gavet was declared incompetent on July 3, 1957, some eight months after the

1956 will had been executed. Evidence on behalf of appellant discloses that she underwent an operation in the latter part of 1954, and another in the summer of 1955. She suffered a broken hip in December of 1955, and was hospitalized until the middle of the following January. From January 13th through May, Mrs. Gavet lived with Mrs. Raines. Six witnesses, in addition to the latter, testified at the hearing in behalf of appellant, namely, Beatrice Anthamatten, heretofore referred to, and her daughter, Margaret Rose Anthamatten, a registered nurse, both of whom were long time friends of Mrs. Gavet; Josephine Branscum, who took care of Mrs. Gavet from October, 1957, until May, 1958; Addie Thomason, a tenant of Mrs. Gavet's; Fred Perry, an acquaintance of Mrs. Gavet for the last fifteen years of her life; and Dr. Elizabeth D. Fletcher, a physician of Little Rock specializing in psychiatry. Testimony from the lay witnesses was to the effect that during the year 1955, Mrs. Gavet became confused, disorientated (in that she did not seem to realize where she was living), was unable to carry on a coherent conversation, suffered a loss of memory, and did not recognize people she had known for a long period of time; several of the witnesses stated that Mrs. Gavet was of the opinion that her mother (who had been dead for many years) was living in the house with her. Further, according to some of the witnesses, though she had formerly been a quiet, kind, and religious person, Mrs. Gavet became loud, "almost wild", would curse, and Margaret Rose Anthamatten testified that she called the Catholic priest a vile name; that she underwent a complete personality change. Dr. Fletcher testified that she saw Mrs. Gavet on October 12, 1957, December 26, 1957, and January 1, 1958. The Doctor stated that she found the patient to be a very sick woman, physically and mentally; that she was psychotic, incompetent, suffering from arteriosclerosis, both generalized as well as the cerebral type. Dr. Fletcher was emphatically of the opinion that Mrs. Gavet was not mentally competent in October, 1956 (a year prior to the first visit of the doctor), to make a will, and that probably she had been incompetent for several years. However, on cross-examination, Dr. Fletcher admitted

that the rate of progress of arteriosclerosis varies considerably in different patients.

Mrs. Raines testified that Mrs. Gavet was not mentally capable of making a will after she left appellant's home in the latter part of May, 1956, and stated that the names of some of the legatees of the 1956 will were listed incorrectly by Mrs. Gavet, though the latter had known these legatees quite well.

In contrast to this testimony, Edward L. Wright, attorney of Little Rock, testified that his first professional contact with Mrs. Gavet was in 1953 when he prepared a will for her, covering her property in France; that in July of 1956, in response to her request, he went to her residence, and obtained the information for a will relating to her American property. Mrs. Gavet gave him complete information about her property and the bequests she desired to make, entirely from memory, without any sort of written memorandum. The witness stated that he had never represented Bishop Fletcher, nor any of his predecessors. Mr. Wright testified that Mrs. Gavet made it plain to him, that though she was grateful to Mrs. Raines for personal ministrations following the breaking of her hip, the testatrix was apprehensive that appellant was seeking to ''get her property''; further, she did not want her will in the physical custody of Mrs. Raines. The Attorney stated that he had known Mrs. Gavet quite well, and there was no question in his mind as to her complete mental competence to make the will. Subsequently, on October 19th, Mrs. Gavet called Mr. Wright and desired to make some small changes in the July 27th will. Since he was scheduled to be away from the city the following day, his partner, Wayne Upton, was requested to draft the new will. These changes did not relate to the property at 806 Center Street, for the provisions of the July 27th instrument and the October 23d instrument, relative to that property, are identical. Mr. Upton, and James D. Storey, who witnessed both wills, testified that Mrs. Gavet was very alert, and apparently clearly understood what she was doing. This testimony was concurred in by Robert Schults and Alston Jennings, who witnessed the will of October 23d.

Daisy Pinkley, one of Mrs. Gavet's tenants, testified that, in her opinion, deceased was competent throughout 1956, though she began to have hallucinations after returning from the hospital in 1957. Judge and Mrs. Audrey Strait of Morrilton, who had known Mrs. Gavet for a long number of years, and who visited with her a number of times throughout 1956, t e s t i f i e d that she appeared entirely rational, and discussed business matters on a clear basis. She always recognized both, and Judge Strait testified that Mrs. Gavet expressed the desire that the church acquire title to the 806 Center Street property. Mrs. Strait testified that during the visits in the latter part of 1956, Mrs. Gavet appeared as normal as ever.

Dr. Amail Chudy, engaged in general medical practice in North Little Rock, and Dr. Jerome S. Levy, a physician of Little Rock, specializing in Internal medicine, testified in behalf of appellee. Dr. Chudy expressed the opinion that Mrs. Gavet was competent in 1956, and stated that she seemed to be rather alert for a person of her age. Dr. Levy, likewise, commented as to her alertness in 1956, and observed no evidence of mental confusion until she entered a hospital in June, 1957.

The competency — or incompetency — of Mrs. Gavet was, of course, entirely a fact question, and the testimony was in irreconcilable conflict. We have frequently stated, —so frequently as to require no citation of authority,— that we will not disturb the findings of a Chancellor on a question of fact, unless such findings are clearly against the preponderance of the evidence. In the case before us, we think the evidence fully supports the findings of the trial court. This is not a case wherein a beloved and close relative is left destitute for the benefit of strangers. Rather, though Mrs. Raines was not a blood relative, she was left a substantial bequest of $4,000. For that matter, the property in question was not devised to the Bishop of the Catholic Church; instead, he was only given the opportunity to purchase it, and only then, after the Probate Court passed upon the reasonableness of his offer, and determined that it represented a fair market value of the property.

456

Summarizing, we are of the opinion that the weight of the evidence reflects that Mrs. Gavet was entirely competent to execute a will on October 23, 1956, and that the provisions of the will so executed on that date, were arrived at by her own mental processes, and entirely free from undue influence or duress.

Affirmed.